## *Affidavit of William C. Zegel*

Before me, the undersigned official duly authorized to administer oaths, appeared William C. Zegel, and having been duly sworn, stated as follows:

I am a Doctor of Science (Sc.D.) in Chemical Engineering, a professional engineer in the States of Florida, Kentucky, and Alabama; and a Diplomate of the American Academy of Environmental Engineers. I am also a Principal Engineer with the firm Water & Air Research, Inc. I have spent 38 years as an environmental consultant serving clients in the areas of environmental chemistry and the movement of pollutants through the environment, including dispersion of releases to the atmosphere. I have been qualified as an expert in circuit and state courts in the areas of environmental chemistry; environmental management, fate, transport and effects of pollutant releases; and in other areas. A summary of my qualifications is in Exhibit 1, attached to this affidavit.

I was retained by plaintiff's counsel to identify, evaluate, and define the actual evacuation zone implemented by the City of Texarkana in response to the October 15, 2005 Union Pacific derailment; the evacuation zones for the chemicals considered during the chemical release resulting from the train derailment, including vinyl acetate, propylene, and chlorine; and the exposure zones for chemicals released from the derailment and the smoke and fumes from the resulting fires. I have conducted the requested work and prepared the report attached to this affidavit as Exhibit 2.

I reserve the right to modify or amend this report based on any additional information which may be provided to me at a later date.

_____
William C. Zegel, Sc.D., P.E.

**NOTARY ACKNOWLEDGEMENT**

Before me, the undersigned authority, a Notary Public in and for Alachua County, Florida, on this day personally appeared ___William C. Zegel_____ known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office, this the 27th day of June, 2006.

_____
NOTARY PUBLIC



Cathleen E. Foerster
MY COMMISSION # DD131182 EXPIRES
September 11, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

# Exhibit 1
# RESUME
# William C. Zegel

**Address** – Water & Air Research, Inc.
6821 SW Archer Road
Gainesville, FL  32608
Voice - (352) 372-1500
FAX – (352) 378-1500
Email: wzegel@waterandair.com

**Education** -  M.E. with high honor Stevens Institute of Technology (Chemical Engineering) 1961
M.S. Stevens Institute of Technology (Chemical Engineering) 1962
Sc.D. Stevens Institute of Technology (Chemical Engineering) 1965

**Experience** -  1979 to date    Water & Air Research, Inc.
1975 to 1979   Environmental Science & Engineering, Inc.
1972 to 1975   RETA, Inc.
1968 to 1972   Scott Research Laboratories, Inc.
1964 to 1968   Allied Chemical Corporation

**Membership** - Air & Waste Management Association
Florida Engineering Society
National Society of Professional Engineers

**Recognition** -  Fellow of the Air & Waste Management Association
Past President of the Air & Waste Management Association
Diplomate of the American Academy of Environmental Engineering
Qualified Environmental Professional of the Institute for Professional Environmental Practice
Professional Engineer, Florida and Alabama

**Publications within the past ten years**

Zegel, W.C. "Clean Air Act Amendments," Florida Engineering Society Journal, June 1997.

Zegel, W.C. "A Comparison of Forces at Work in Urbanization and American Urban Sprawl," City Development Strategies, Issue No. 1, Oct. 1999.

**Cases in which I have testified as an expert at trial or been deposed within the past four years**

Deposition INRE: CSX Tank car litigation; provided expert testimony in air modeling of tank car leaking butadiene and resulting explosion and fire in New Orleans, LA.

Deposition INRE: CSX train collision; provided expert testimony in air modeling of tank car releasing acetaldehyde near Nitro, WV

Trial testimony Federal Court Expert Witness; Deposition, Circuit Court for Butler Enterprises, Inc. regarding state of chlorinated solvent contamination of groundwater. 2003; Gainesville, FL; Settled through mediation.

Trial testimony at Administrative Hearing, Expert Witness for Past Land Owner; St. Augustine, Florida regarding timing and nature of release of petroleum products on their former property to establish liability for cleanup costs. Administrative Hearing; Florida Department of Administrative Hearings, Tallahassee, FL.

Deposed in Watson Construction Co., Inc. v. City of Gainesville Case No. 1:05cv94

Deposed in Presley, et al. v. Air Products and Chemicals, Inc. Santa Rosa County Court Case No. 99-528-CA Air modeling of large releases of ammonia and light amines and historic releases of vinyl chloride and chromium.

Deposed, INRE: Kinder-Morgan Private Mediation, Tucson, AZ expert witness for plaintiffs, provide air modeling of petroleum pipeline break

Served as independent referee, analyzed and reviewed air modeling and operational data in resolving a dispute between the Sierra Club and St. Johns River Power Park regarding fuel modification for their coal-fired power plant; Jacksonville, FL

Performed a peer review for contamination assessment and remediation activities associated with chlorinated solvents in groundwater at the Florida School for the Deaf and Blind, St. Augustine, FL

**Compensation**

Received a $5,000 retainer from plaintiff's counsels. Billings to date total $5,890.05. Billings in preparation for work performed but not yet billed is $5,145.31. Future work will be performed at standard rates plus expenses. My Standard Rate is $170 per hour.

**Exhibit 2 - Investigation of a Union Pacific Derailment on October 15, 2005 in Texarkana, Arkansas**

**1. Scope of Work**

I was requested by plaintiff's counsels in the above matter to do the following:
    A. Identify, evaluate, and define the actual evacuation zone implemented by the City of Texarkana in response to the October 15, 2005 Union Pacific Derailment
    B. Identify, evaluate, and define the evacuation zones for the chemicals considered during the chemical release resulting from the train derailment, including vinyl acetate, propylene, and chlorine.
    C. Identify, evaluate, and define exposure zones for chemicals released from the derailment and the smoke and fumes from the resulting fires.

**2. Overview of the event**

An accident occurred between two Union Pacific trains just before 5:00 am on October 15, 2005, in Texarkana, AK, which resulted in the derailment of several freight cars including a tank car of pressurized, liquid propylene (a.k.a. propene). As a result of the derailment, a tank car containing propylene was compromised and propylene was released. The escaping propylene migrated to the south and east where it encountered an ignition source, exploded and burned, igniting the propylene still leaking from the tank car and several secondary fires in the area. The secondary fires included a bridge of creosoted timbers, a trestle over Nix Creek partially made of creosoted timbers and its associated railroad ties, empty boxcars, two homes, seven vehicles, and brush and trees in the area. The secondary fires were controlled during the day while the remaining propylene fire fed by the escaping tank car vapor was allowed to burn to consume the chemical. The propylene fire went out about 1:00 am on October 16, 2005.

**3. Data or other information considered**

A. Visit to the site of the derailment and resulting fires on January 12, 2006 to: assess local topography, relative locations of resulting fires to the derailment site, seek remaining evidence of exposure to fire in local vegetation and wooden structures, and obtain local USGS quad map and local aerial with topography.

B Telephone Interview with David Hall, Emergency Management Coordinator for Texarkana, June 12, 2006

C. Train Derailment Timeline 10/15/05 prepared by Emergency Management Texarkana

D. After Action Report – Union Pacific Train Derailment 10/15/05 by Emergency Management Texarkana

E. Meteorology History for Texarkana, Arkansas on Saturday, October 15, 2005 data taken by NOAA

F. Combustion Products of 1,3-Butadiene are Cytotoxic and Genotoxic to Human Bronchial Epithelial Cells by W. James Catello, Christopher H. Kennedy, William Henk, Steven A. Barker, Stephen C. Grace, and Arthur Penn in Environmental Health Perspectives Volume 109, Number 9 September 2001 pp965 to 971

G. Hazardous Substance Fact Sheet for Coal Tar Creosote from New Jersey Department of Health and Senior Services

H. Creosote Retention Levels of Timber Highway Bridge Superstructures in Michigan's Lower Peninsula by James P. Wacker, Douglas M. Crawford, and Merv O. Eriksson, National Wood in Transportation Information Center, Forest Products Laboratory, Forest Service, USDA

I. Emergency Response Report for Union Pacific Train Derailment, Intersection of Dudley and Jackson Streets, Texarkana, Miller County, Arkansas; prepared for U.S. Environmental Protection Agency Region 6 under Contract No. 68-W-01-005 by Weston Solutions, Inc., Robert Beck, VP, P.E., Program Manager, November 29, 2005

J. Polycyclic aromatic hydrocarbons in combustion residues from 1,3-butadiene by W. James Catallo, Laboratory for Ecological Chemistry, School of Veterinary Medicine, Louisiana State University, Baton Rouge, LA, Chemosphere Volume 37, Issue 1, July 1998, Pages 143-157

K. "Compilation of Air Pollutant Emission Factors." Office of Air Quality Planning And Standards, USEPA

L. Damage reports authorized by B. Honea, Fire Chief on October 16, 2005

M. Descriptive Micrometeorology by R.E. Munn, Academic Press, 1966

N. Material Safety Data Sheet for Coal Tar Creosote Treated Wood from Kerr-McGee Chemical LLC; Issued August, 2002

O. Plaintiff's Initial Complaint and all amended complaints and Defendant answers

P. Plaintiff's Initial Disclosure Statement, including the following documents: TSP1-0054, UP0001-0096, TERC1-00040, ADEQ1-00031, TDEQ1-8, ACIM1-2, video footage and digital photographs including aerial video from helicopters and news coverage.

Q. Plaintiff's First Supplemental Disclosure Statement, including the following documents:EPA1-00517

R. Defendant's Initial Disclosure Statement including the following documents: UP00001-003501

S. Defendant's Supplemental Disclosure Statement including: photographs UP003502-003742

T. Police Car Video UP003743

**4. Analysis of the incident**

David Hall, Emergency Management Coordinator for the City of Texarkana, was interviewed and provided a timeline of events following the derailment incident. Mr. Hall indicated that a 911 call was placed at 4:58 am citing a chemical smell in the area of the derailment. The derailment occurred just prior to the 911 call and a derailed tank car that was found to be containing propylene was located at UTM Zone 15, NAD 27 403,821.334 meters Easting 3,698,114.44 meters Northing. Mr. Hall said that an early report initially stated that a derailed tank car contained vinyl acetate, but was later modified to say that it contained propylene. A large explosion was reported about 10 minutes after the first 911 call. A police patrol car had been sent to investigate the reported derailment and odor. The video in the police car recorded the explosion and subsequent fires as the car backed out of Hobo Jungle Park. We were provided a copy of that video for review. The movement of the fire from the east to the west and the appearance of smaller flames nearer to the car are consistent with a spreading of the propylene, which is heavier than air, through the drainage ways and creeks of Hobo Jungle Park. The explosion would have resulted when a part of this vapor cloud encountered a flame (such as a pilot light) or a spark. The traveling fire observed from the video was the flashback to the tank car, up Nix Creek, and into the small creek that crosses Hobo Jungle Park close to the location of the police car.

Mr. Hall arrived on the scene and set up lines of communication with the various agencies

Mr. Hall reported the wind as calm and the night clear. At night, the absence of solar heating causes the atmospheric convection to decrease, and the urban boundary layer begins to stabilize. With calm winds and a clear night, as reported for the night of October 14-15, the relatively warm urban area formed a nighttime air temperature urban heat island (UHI). During a clear night, surfaces lose heat principally by radiation to the (comparatively cold) sky. Such radiative cooling is more dominant when wind speed is low and the sky is cloudless. The UHI has been found to be largest at night in these conditions.

The UHI induces a circulation cell in which air drifts in at low levels toward the center of the city. This drift is guided by topographic drainage patterns. On the south side of Texarkana, this drainage way is Days Creek. Days Creek splits into Swampoodle Creek drainage way and Nix Creek drainage way just south of the rail yards. As the cool air moves up Nix Creek, the main rail line and the edge of the urban area act as barriers, forcing the air to the west over Hobo Jungle Park and Jackson Street. A low velocity such as 1 mile per hour (mph) occurs under such conditions. We used that velocity for the wind as it moved to the east-northeast in the vicinity of the accident. This was confirmed by Mr. Hall when he reported the evacuation of the convalescent home at 2107 Dudley at 7:15 am because of persistent reports of the odor of smoke. This address is about a mile east of the site of the derailment. After the sun rose at 7:21 am, it began to heat the surfaces, causing a gradual increase in atmospheric turbulence, which, in turn, acted to break up the UHI drainage pattern. Although the weather station at the airport continued to register no measurable wind (calm), real-time pictures of the plumes taken some time after

sunrise show a very light wind toward the west southwest. The weather station reported calm wind until a more northerly wind was established about 11:00 am.

An examination of pictures of the hole through which the propylene was released under pressure (UP003632 and UP003633) shows a large, deep dent with an irregular puncture/tear in the metal of the end cap of the tank. The tank had a capacity of 123,444 liters (33,667 gallons), and was reported to have been carrying 129,700 pounds (lb) of propylene. Liquid propylene has a density of about 0.609 grams per cubic centimeter (g/cc). Thus, 129,700 lb of liquid would occupy 98,805 liters, which is 78.42% of the tank volume. Based upon pictures taken at the scene, (UP003595 and UP003574), the tank came to rest in a horizontal position with the bottom of the hole located about 0.56 of the tank diameter above the bottom of the tank. The hole was below the level of the liquid in the tank. Under tank pressure, about a quarter of the liquid propane was forced out of the tank in a short time after the tank came to rest, before vapor from the boiling propylene in the tank was allowed to pass through the hole. The ejected liquid quickly boiled to produce dense propylene gas that quickly filled the Nix creek basin north of the tracks. Under the action of gravity, the dense gas flowed south through the opening beneath the trestle into Hobo Jungle Park. There, it filled low areas to the east and south connected to Nix Creek. Under the action of the very light west wind, more of the propylene accumulated on the east side of the park than on the west. The patrol car located on the west side of the Park reported a chemical smell slowly moving to the south. The levels on the west side did not stall the patrol car nor was it set aflame by the operation of the patrol car. However, another automobile located adjacent to the derailment site did stall and its occupants ran from the area. Further east, the vapor penetrated the drainage system into the conduit on the north side of Arthur Street. It also accumulated to a depth sufficient to penetrate the two houses that were destroyed on Jackson Street, and possibly have been set aflame by a pilot light in one of them.

The ignition of the propylene gas produced an explosion and large fireball on the eastern edge of Hobo Jungle Park at 5:08 am, according to Mr. Hall. Based on a review of the video from the patrol car on the west side of the park (UP003743), the propylene flashed back over the next minute or so. The flame traveled back to the tank car and on up Nix Creek as well as through the stormwater drainage system in Hobo Jungle Park. The resulting fireballs set aflame a creosote timber bridge, the creosote timber part of the trestle, railroad ties on the trestle, two houses, seven vehicles, and brush and trees adjacent to the various drainage ways.

## 5. Evacuation

Mr. Hall reported that the Emergency Management response to the event had employed the Computer-Aided Management of Emergency Operations (CAMEO) software system. This software was distributed by the National Safety Council, in cooperation with the Environmental Protection Agency and the National Oceanic and Atmospheric Administration. CAMEO was designed to aid emergency response by providing information and recommendations for more than 4,000 hazardous chemicals, local maps with special location information, and an air dispersion model to evaluate hazardous chemical releases. This software is particularly useful and reliable for suggesting evacuation zones.

Use of this software in emergency response situations is recommended by the National Safety Council, Environmental Protection Agency, and the National Oceanic and Atmospheric Administration, and is also used in emergency planning applications. The dispersion model that is part of CAMEO is Areal Locations of Hazardous Atmospheres (ALOHA). ALOHA was designed especially for use by people responding to chemical accidents, as well as for emergency planning and training. ALOHA can predict the rates at which chemicals may escape into the atmosphere from broken gas pipes, leaking tanks, and evaporating puddles. It can then predict how a hazardous gas cloud might disperse in the atmosphere after an accidental chemical release.

We ran the software to estimate logical evacuation zones. Mr. Hall reported that the weather station at the airport was showing calm winds all during the first hours of the incident. In this case, CAMEO uses default values for the wind. In order to establish an evacuation zone, a large tank car (33,000 gal) full of a leaking chemical was used. In a derailment, the largest hole in a tank car often occurs when a coupling from another car pierces the end of a tank car. Such a hole could be between 10 to 40 square inches (sq. in.) near center of tank. In order to establish an evacuation zone, a 6" x 6" hole in the end of the tank was used. According to the first report, the chemical of concern was vinyl acetate. CAMEO suggests the level of concern for vinyl acetate is 10 parts per million (ppm). The wind entered into the software as calm. In this instance, the software has a default minimum wind velocity and allows it to blow from any direction. It recommended an evacuation radius of 3.1 miles in all directions to avoid exposures greater than 10 ppm. This evacuation zone is shown in Figure 1 B.

The next report was that the chemical of concern was propylene and not vinyl acetate. With propylene, the level of concern becomes the Lower Explosive Limit (LEL), which is reported to be two percent in air. The software suggests an evacuation radius of 847 yards (0.48 miles) in all directions to avoid exposures above the LEL. This evacuation zone is shown in Figure 1 C.

After the explosion occurred and the fires started, the concern was shifted to other tank cars in the train that were near the derailed cars. The cars of concern that could be affected by the fires contained propylene and chlorine. Chlorine is of greater concern than propylene because of its toxicity. Replacing the propylene with chlorine in our calculations suggested an evacuation radius of at least six miles to avoid exposure over the 10 ppm level immediately dangerous to life or health (IDHL). This evacuation zone is shown in Figure 1 A for comparison with other CAMEO-recommended evacuation zones.

Mr. Hall reported that the evacuation radius was set at one-mile in all directions from the site of the derailment. This determination has a rational basis in the application of the CAMEO recommendations and is entirely reasonable given the three zones that could have been used: 6 mile radius for chlorine, 3.1 miles radius for vinyl acetate, and 0.48 miles radius for propylene. After the other propylene cars and the chlorine car were removed from the area, the evacuation zone was reduced to the area occupied and used by heavy equipment involved in the cleanup. Mr. Hall mentioned that Captain Vaughn of Texarkana Police Department utilized the Amber Alert telephone system to help implement the evacuation. The implemented evacuation zone is shown in Figure 1 C to compare with the CAMEO-generated evacuation zones discussed earlier. The evacuation zone contains approximately 276 businesses; 2,942 homes; and a population of 7,982.

## 6. Chemicals to which people were exposed

People in Hobo Jungle Park and just east of the Park were exposed to propylene. It is possible for propylene to asphyxiate people if the levels are high enough to limit access to oxygen. However, even levels below asphyxiation pose great danger from explosion if the level exceeds the LEL.

Once ignited, propylene is not a clean burning chemical under the conditions of the derailment. It is seen to create a dark black plume that is easily picked out of the pictures of the overall smoke plume enveloping southern Texarkana on the morning of the derailment. This soot contains substantial amounts of polynuclear aromatic hydrocarbons (PAHs), fine particulates (<2.5 µm), and organic chemicals absorbed by the particulates.

Burning wood impregnated with creosote also produces fine particulates containing high levels of creosols and PAHs. There is little data on chemicals produced by thermal decomposition of creosote or creosoted wood. However, coal tar creosote, used as a preservative for railroad ties, telephone poles, and timbers, is a product of a high temperature distillation of coal tars. As a result, it is expected that much of the chemicals pass through an accidental fire unchanged. Because a multiplicity of undesired combustion products may be generated, most states have prohibited disposal of wood containing creosoted residues by burning. Producers of coal tar creosote treated wood also warn users that burning treated wood creates a hazard because it may produce toxic and irritating gases or fumes.

Burning vehicles also produce fine particulates and PAHs. Fine particles are also produced by burning structures and vegetation. The low temperature combustion of vegetation has been shown to produce dioxins, which are also chemicals of concern.

**7. Area of exposure**

The area of exposure to propylene prior to its ignition was estimated by CAMEO as a 0.48 mile distance from the site of the derailment. However, this distance must be measured through the creeks, stormwater drainage ways, and other low areas in the vicinity because of the density of the gas. By this means of measurement, the destroyed houses are approximately 0.48 miles from the leaking tank car.

After the explosion and ignition of the propylene and secondary fires, the area of exposure is very different. Burning the remainder of the propylene, as well as the homes, vehicles, structures made from creosote-preserved wood and vegetation and brush produces smoke plumes of combustion products which include PAHs, creosols, fine particulates, and products of partial combustion absorbed on carbonaceous fine particulates. Initially, the plume containing these chemicals moved to the east northeast of the fires.

The model INPUFF2 was used to estimate exposure to PAHs and coal tar creosote. This model was selected because it could accommodate the various individual fires and the observed wind field as it changed during the day. The model estimates that populations within the zone presented in Figure 2 were exposed to significant levels of PNAs and other creosote chemicals. This assertion is based on the assumptions made in the modeling and may be modified as more information becomes available. The levels in this area were significant in relation to both the OSHA limit of 200 µg/cu m as an 8-hour average and 80,000 µg/cu m as a 30-minute level immediately dangerous to life or health (IDLH). It is also significant with regard to the fact that coal tar creosote is a probable carcinogen in humans and there may be no safe level of exposure.

Exposure to the east northeast occurred before the evacuation and during its initial implementation, perhaps 5:00 am to 7:30 am. After sunrise, the wind flow shifted toward the west southwest with significant concentrations of particulates and PAHs dispersed in this direction, perhaps from 7:30 am to 10:30 am. The morning sun also provided energy to the atmosphere to improve vertical mixing and dispersion of the smoke plumes. Thus, exposures to the west southwest did not reach the levels found in the east northeast, but the levels persisted for a longer period of time.

**8. Effect of exposure** – The plumes contained high levels of fine particulates. These particulates included carbonaceous soot with absorbed chemicals, including carcinogens. The toxicologic and epidemiologic consequences of exposure to such complex soot have not been well investigated. However, the inclusion of significant quantities of creosote and products of partial combustion of creosote makes them more dangerous. For example, coal tar creosote which is generally used in railroad ties and timbers has a recommended ACGIH airborne exposure limit for workers of 200 µg/cu m averaged over an eight-hour work shift and an IDLH of 80,000 µg/cu m. Populations including more sensitive individuals could show symptoms at lower levels. Frequently a factor of ten is used to express this added sensitivity of the general population relative to the general workforce. This would reduce the eight-hour exposure limit to 20 µg/cu m and the IDLH to 8,000 µg/cu m.

**9. Conclusion**

In conclusion, in this report I have done the following:

A. Identified and defined the actual evacuation zone that was established by Texarkana in response to the derailment. This zone was enclosed by North Oats Street on the east, East 9th Street on the north, State Line Avenue on the west to West 8th Street. The edge of the zone then follows West8th Street to Elm Street to the intersection of Ida Avenue. Then it follows Ida Avenue on the west and Forest Avenue on the south.

B. Identify, evaluate, and define the evacuation zones for the chemicals considered during the chemical release resulting from the train derailment. These were a 0.48 mile radius from the leaking tank car for propylene, 3.1 mile radius for vinyl acetate, and 6 mile radius for chlorine.

C. Identify, evaluate, and define exposure zones for PAHs and other creosote chemicals. This exposure zone is shown in Figure 2 of the report.

DATED: June 27, 2006.

William C. Zegel, Sc.D., P.E.